IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ANTONIA ROYBAL-MACK,
as Personal Representative of the
Wrongful Death Estate of
KORI LYNN WOODS,

       Plaintiff,

    vs.                                     No. 17-CV-552-WJ-KK

NEW MEXICO DEPARTMENT OF
PUBLIC SAFETY, OFFICER
MARK QUINTANA and OFFICER
DIEGO MENDOZA, individually
and in their official capacities, and
JOHN and JANE DOES #1-10,

       Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## AS TO COUNT I BASED ON QUALIFIED IMMUNITY

THIS MATTER comes before the Court upon a Motion for Summary Judgment based on Qualified Immunity, filed on July 12, 2017 by Defendants New Mexico Department of Public Safety("DPS"), Officer Mark Quintana and Officer Diego Mendoza ("Defendants") **(Doc. 19)**. Having reviewed the parties' pleadings and the applicable law, the Court finds that Defendants' motion is well-taken and, therefore, is granted.

### BACKGROUND

Plaintiff's claims arise from the Defendant Officer's high-speed pursuit of a vehicle driven by Kyle Mawhorter ("Mawhorter"), in which Kori Lynn Woods was a passenger and

which resulted in a single-vehicle collision killing Ms. Woods.

The facts in the Complaint are summed up in the Joint Status Report (Doc. 13). They bear repeating for purposes of context. In November 2016 near Clovis, New Mexico, at night, New Mexico State Police ("NMSP") Officer Quintana initiated a traffic stop for speeding on a Chevrolet pick-up truck driven by Mawhorter in which Ms. Woods was riding as a passenger. Officer Quintana activated his patrol unit's emergency equipment directing Mawhorter to stop the vehicle on the shoulder of the highway. Mawhorter failed to stop and Officer Quintana pursued Mawhorter (at speeds, according to Defendants, close to 100 m.p.h.) along US 70 traveling northbound. NMSP Officer Mendoza was also patrolling that stretch of the highway and was dispatched to assist Officer Quintana. Both police cruisers were using their overhead emergency lights and sirens, and recorded the chase on their dash-cam videos (attached as Exhibits 2 & 4).

Defendants' version of events is that at one point Mawhorter deliberately crossed into the southbound lanes of US 70 and began traveling north at speeds of 90-100 mph against oncoming traffic at night, causing the southbound vehicles to swerve in order to avoid being hit. The officers at that point decided to continue their pursuit of the vehicle for public safety reasons.

About five minutes into the pursuit, Officer Mendoza attempted a Pursuit Intervention Technique ("PIT") maneuver on Mawhorter's vehicle. The first PIT maneuver was unsuccessful, but the second one brought Mawhorter's vehicle to a stop. However, after stopping, Mawhorter reversed the pick-up truck and again began traveling north on the southbound lanes of US 70. According to Plaintiff's version, Officer Mendoza advised dispatch at this time that there was a female passenger (Ms. Woods) in Mawhorter's vehicle. Officer Quintana attempted a third but unsuccessful PIT maneuver when Mawhorter began traveling

2

west on the eastbound lanes of Brady Avenue in Clovis, New Mexico, that is, continuing to drive against traffic. The pursuit continued until Mawhorter lost control of the pick-up truck and crashed into a metal fence[1] at the intersection of West Brady Avenue and South Hull Street in Clovis. Mawhorter fled the vehicle on foot but was eventually found in a field and ultimately pled guilty to various felony charges stemming from the incident. Ms. Woods was pronounced dead at the scene.

On March 31, 2017, Plaintiff as the personal representative of Ms. Woods' estate, filed a five-count complaint in the Second Judicial District Court in Bernalillo County, asserting federal civil rights and state law tort claims. Defendants removed the case to federal court on May 15, 2017 and filed a motion seeking dismissal of the state claims asserted in Counts II, III, IV and V. The Court granted Defendants' motion, finding that Plaintiffs' claims asserted under §41-4-12 of the Tort Claims Act were premised on negligent conduct, which is insufficient for a waiver of immunity under the Tort Claims Act. Doc. 18 at 6.

Plaintiff then filed a motion seeking the Court's reconsideration of its rulings on the state law claims and a request to amend the complaint, both of which the Court denied. Doc. 40. With the dismissal of the state law claims asserted in Counts II, III, IV and V, only Count I remains in this case, asserting civil rights violations pursuant to 42 U.S.C. §1983.

**I.     Legal Standard**

Defendants have asserted the defense of qualified immunity, which shields government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Romero v. Story*, 672 F.3d 880 (10th Cir. 2012).

When a defendant moves for summary judgment on the basis of qualified immunity, the

---

[1] The parties describe the barrier that the vehicle crashed into as a metal fence.

plaintiff bears a heavy two-fold burden. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). The plaintiff must put forward evidence showing (1) that the defendant violated plaintiff's constitutional rights, and (2) the right at issue was clearly established at the time of the violation. *Id*. If the plaintiff fails to establish either part of the two-part inquiry, the court must grant the defendants qualified immunity. *Id.* If the plaintiff meets her burden of coming forward with facts or allegations which would demonstrate that the defendant's alleged violation should have been apparent in light of preexisting law, then the defendant assumes the normal summary judgment burden of establishing that no material facts remain in dispute that would defeat its claim of qualified immunity. *See Woodward v. City of Worland*, 977 F.2d 1392, 1396-97 (10th Cir. 1992). In determining whether summary judgment is appropriate, the Court considers the facts and all reasonable inferences drawn therefrom in a light most favorable to the nonmoving party. *Hollander v. Sandoz Pharmaceuticals Corp.*, 289 F.3d 1193, 1214 (10th Cir. 2002).

## II. Undisputed Facts[2]

The facts describing the pursuit as well as other material facts have been presented above in the background and are undisputed, despite Plaintiff's efforts to create disputes which the Court addresses next.

Plaintiff disputes Defendants' statement in Fact 3 that US 70 was generally a "heavily-travelled route" between Clovis and Portales. Plaintiff contends that at the time of the police pursuit in this case, there was very little traffic on either the northbound or southbound lanes of US 70. As an initial matter, the Court notes that the officers' dash-cam videos establish what

---

[2] The facts set forth in this section are undisputed unless otherwise noted. Also, references to supporting exhibits are included in the briefs and for ease of reading, are omitted here.

Also, Plaintiff failed to comply with this Court's local rule requiring a non-movant to set forth separately the responsive facts and the additional facts. *See* D.N.M.LR-Civ.56(1)(b). This made it difficult to determine which are responsive facts and which are additional facts, although Plaintiff has presented nothing in either category which would preclude summary judgment.

4

anyone familiar with the major highways in the State of New Mexico knows and that is US 70 is a four lane highway separated by a median. There is certainly some room for a difference of opinion as to what constitutes "heavy" traffic, since everything is relative when, for example, comparing traffic in Los Angeles or New York City to traffic in Albuquerque or Clovis. However, the dash-cam videos show that between the time Mawhorter started driving northbound in the southbound travel lanes and the time he crashed, a significant number of vehicles either passed or were forced to swerve or pull over to avoid Mawhorter's vehicle. Both officers considered the traffic to be heavy. *See* Doc. 26-2 (Ex. B) at 4 ("there was a lot of traffic coming southbound . . . ."); Doc. 26-3 (Ex. C) at 7 ("heavy traffic headed southbound"). By Defendants' count, approximately twenty-three other vehicles were encountered in that time period, but the Court has not confirmed that number by actual count. Because the pursuit occurred at night, the headlights of the oncoming traffic were easily visible. On viewing the dash-cam videos, the Court is left with the definite impression that traffic was considerable, if not "heavy" for most of the time during the pursuit.

The video evidence also dispenses with Plaintiff's purported "dispute" of fact presented in paragraph (b) regarding Defendant's Fact 11. Plaintiff disputes the fact that the Chevrolet pick-up truck driving northbound in the southbound lanes, at speeds up to 90-100 miles per hour, posed a "danger to the vehicles traveling southbound" because the dash-cam videos from both officers police cruisers (Exs. 2 and 4) show that all southbound vehicles pulled safely off the roadway as the Mawhorter vehicle and the police cars approached. Plaintiff's interpretation of the video footage is unfounded, since the footage also shows that the officers were closely following Mawhorter using their emergency overhead lights and sirens to warn the public. Thus, danger to the public was mitigated *because* of the presence of the officers, and Defendant's Fact

11 will be considered as undisputed by the Court. Further, it is beyond credulity that one could dispute the fact that traveling against the traffic on a major four lane highway at night when multiple vehicles are present does *not* pose a danger to those vehicles. The Court cannot help but wonder if Plaintiff's counsel watched the same dash-cam videos that the Court watched.

In Fact 13, Defendants state that as Mawhorter's vehicle and the pursuing officers approached the City of Clovis and the posted speed limit dropped from 65 mph to 50 mph, the Chevrolet pick-up truck continued going against oncoming traffic at speeds of about 90-100 mph with approximately thirteen oncoming, southbound vehicles being forced to swerve off the roadway to avoid being hit by the weaving pick-up truck. Plaintiff disputes this fact in paragraph (c), claiming that the dash-cam footage does not show Mawhorter's vehicle traveling at speeds of "90-to 100" mph. There is no dispute created here for two reasons. First, even at lesser speeds, the danger would still be present; and second, Plaintiff's own evidence reflects that the truck was traveling 80-90 mph (Ex. B (Doc. 26-2) at 5; Ex. 2 (Quintana Video) at 6:44:26 pm (reflecting speed of 99 mph).

In paragraph (e), Plaintiff disputes Fact 17, claiming that the officers' statement that they were unable to attempt another PIT maneuver after Mawhorter turned west on Brady is "flatly contradicted" by Officer Quintana's statement to investigators. This is not a "dispute" at all, but merely a quibble with semantics. Defendants' Fact 17 states in part that after Mawhorter turned west onto Brady and driving in the eastbound lanes, the officers "were unable to attempt another P.I.T. maneuver" and again requested dispatch to ask a supervisor whether they should continue or discontinue, their pursuit. In his interview, Officer Quintana stated that when he saw Mawhorter "traveling eastbound . . . that's when I made the attempt to do the PIT . . . but I missed and that's when I slowly . . . began to back off . . . ." Ex. 26-3 at 8:20-9:1-5. Before

Officer Quintana could make another PIT attempt, he saw Mawhorter crash into the fence. There is nothing inconsistent between Defendants' Fact 17 and Officer's Quintana's interview statements, and certainly nothing that creates a material factual dispute. An "attempt" could refer merely to the technical execution of a PIT maneuver that missed its mark, or to the inability to execute it. Regardless, it remains undisputed that within the few minutes between the second P.I.T. maneuver on US 70 (stopping Mawhorter's vehicle only temporarily) and the time it crashed, the officers intended to perform a third PIT maneuver in an effort to halt Mawhorter, but were unable to do so, and before they could attempt another PIT maneuver, Mawhorter crashed the Chevrrolet pick-up truck into the metal fence. The dash-cam videos (Defts' Exs. 3 & 4) corroborate Defendants' statement and Officer Quintana's testimony. Both video tapes show Officer Quintana sidling up to Mawhorter's pick-up truck which was traveling east on westbound Brady, both vehicles were traveling at high speed, with Quintana staying close to the lane shoulder to avoid hitting oncoming traffic while looking for an opening to perform the maneuver. At the last second, however, Officer Quintana veered back off toward the shoulder again, having come close to executing the maneuver but not completing it.[3]

In paragraphs (d) and (g), Plaintiff cites to particular statements made by Mawhorter to DPS investigators, such as the reason for Mawhorter's trip from Denver, the fact that Ms. Woods did not know the truck was stolen, that Ms. Woods was "freaking out" and thought Mawhorter was "going way too fast." Ex. D (excerpts).[4] Defendants do not dispute what Mawhorter said after the crash, but these statements are irrelevant to what the officers knew and observed during the incident. Plaintiff also takes issue with the "suggested inference" that Ms. Woods voluntarily

---

[3] The videotapes indicate that the failed P IT attempt occurred at 6:46:00 p.m., a little more than half a minute before the crash.

[4] For paragraph (g), Plaintiff refers to no particular fact presented by Defendants, which leads the Court to assume that this paragraph consists entirely of "additional facts."

remained in the pick-up truck after it was rammed to a stop after the first successful PIT maneuver. Officer Quintana stated in his affidavit that when Mawhorter's vehicle came to a stop, he was able to observe that the young female passenger made no attempt to exit the truck and instead reached down as if snapping her seat belt into place. Ex. 1, 15-16.

Plaintiff contends that it is undisputed that Ms. Woods wanted to get out of the vehicle, based on Mawhorter's interview statements. Ex. D at 11:15-16; 12:6-7. However, even viewing the facts favorably to Plaintiff, a reasonable fact finder could not make the inference that Ms. Woods wanted to exit the vehicle in light of statements made both by Officer Quintana and Mawhorter. It is undisputed that during the short time in which the truck was stopped, both officers had exited their vehicles with weapons drawn and that during this stop, neither the driver nor passenger exited, attempted to exit the vehicle, or made any gestures suggesting that they wanted to exit the vehicle. Quintana stated that during the approximately five seconds Mawhorter's truck was stopped on the north shoulder (and the video confirms this time span), he observed Mawhorter and Ms. Woods "just look at us" before the driver resumed his flight. Mawhorter also stated that Ms. Woods, not he, had been smoking marijuana while they drove; that the marijuana would be found in the glovebox and that during the flight he had asked Ms. Woods to "look up the map so I could see [where] the next town was." Doc. 26-4 (Ex. D) at 13. Inferences must be reasonable, and here one cannot make the inferences suggested by Plaintiff. At any rate, whether or not Ms. Woods was a willing passenger is not dispositive of the substantive inquiry which considers whether the officers' conduct was excessive under the Fourteenth Amendment.

Somewhat incredulously, Plaintiff challenges Defendants' Fact 19. In paragraph (f), Plaintiff disputes Defendants' description of the pursuit as follows, based on the officers' recollection of events:

> The situation was tense, fast-moving, rapidly evolving and fraught with the danger of death or serious bodily injury to the driver and his passenger, members of the public residing along the roadways, the twenty-three or so other oncoming drivers and their passengers who had been forced to swerve or stop, and the two police officers.

Deft's Fact 19 (based on Ex. 1, ¶20 and Ex. 3, ¶17). The dash-cam videos speak volumes and easily undercuts Plaintiff's attempts to create a dispute on this fact. It is difficult to watch the footage of this seven-minute car chase without feeling an immediate presence of lurking danger during the entire time. Plaintiff's challenge to Fact 19 on this basis is unsuccessful.

Plaintiff also notes that the officers had actually decided to "22" (suspend) the pursuit early on. *See* Doc. 26-2 (Ex. B) at 3 and 12; Doc. 26-6 (Ex. F) at 6. The officers did in fact intend to discontinue the pursuit four or five minutes into the pursuit—that is, until Mawhorter decided to enter the southbound lanes of traffic.[5] Mawhorter stated in his interview that he began traveling against traffic "in hopes that [the officers] would back off because the risk to the public would be too great." Doc. 26-4 (Ex. D) at 12. Both officers stated that at that point, they became concerned for public safety and pursued Mawhorter into oncoming traffic in order to warn drivers, using their emergency overhead lights and sirens. *See* Doc. 26-2 (Ex. B) at 4 (Officer Mendoza "thought somebody was going to get killed, especially going [into] oncoming traffic, so I took the decision [to attempt a P.I.T. maneuver to stop the Chevy]"); Doc. 26-3 (Ex. C) at 7 (Officer Quintana's statement that they "got onto the southbound lane and attempt to warn the southbound public that there's a vehicle"). Ironically, then, it was Mawhorter's decision

---

[5] The video footage confirms the officers' intentions to discontinue the chase. According to the time indicator on the video, the pursuit began at 6:38:59 p.m., and dispatch advised a "10-22" at 6:42:52 p.m.. Ex. 2 (Mendoza video).

9

to endanger the public that changed everything from the officers' perspective and caused them to continue the pursuit.

Plaintiff's remaining attempts at creating a dispute also fail. In paragraphs (j) through (r), Plaintiff relies on a state statute, the New Mexico Law Enforcement Safe Pursuit Act ("LESKA"), and agency policies and procedures regarding the use of force, vehicular pursuits and PIT maneuvers. However, alleged violations of state law or state administrative provisions are not relevant to claims under 42 U.S.C. §1983. *Davis v. Scherer,* 468 U.S. 183 (1984); *Tanberg v. Sholtis*, 401 F.3d 1151, 1163 (10th Cir. 2005) ("violation of police regulations is insufficient to ground a §1983 action for excessive force"). For example, under the requirements of LESKA, high speed pursuits are to be terminated when, inter alia, the identity of the driver is known and there is no longer a need for immediate intervention; and the danger to the public is greater than the value of apprehending the suspect. These considerations may be subsumed in the substantive inquiry but they are not controlling because the question is whether the officers violated Ms. Woods' constitutional rights under a Fourteenth Amendment analysis.

The Court will therefore consider Defendants' factual statements as undisputed in their entirety.

## DISCUSSION

Defendants contend that (1) Count I fails to state a claim under §1983 against Defendants DPS and the NMSP and the officers in their official capacities; and (2) that Plaintiff fails to state a claim under §1983 against Officers Quintana and Mendoza in their individual capacities under either the Fourth or Fourteenth Amendments.

Before embarking further, the Court must address the matter of the proper standard to apply in this case. Count I alleges violations of the Fourth as well as the Fourteenth

Amendment. Specifically, Plaintiff alleges a violation of the right to be free of unreasonable searches and seizures, the right to be free from excessive force by police officers (both Fourth Amendment claims), and the right not to be deprived of life or liberty without due process of law (Fourteenth Amendment).

The Fourth Amendment covers only "searches and seizures," and is relevant only where a seizure has occurred. Under both United States Supreme Court and Tenth Circuit precedent, high-speed police pursuits resulting in injury or death do not involve "seizures" under the Fourth Amendment. *Cty of Sacramento v. Lewis,* 523 U.S. 833, 844 (1998) (holding "that no Fourth Amendment seizure would take place where a 'pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit,' but accidentally stopped the suspect by crashing into him.") (internal quotation omitted); *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 1550-1551(1991) (police pursuit in attempting to seize a person does not amount to a "seizure" within the meaning of the Fourth Amendment).[6]

Based on relevant case law and precedent, Plaintiff cannot assert a Fourth Amendment claim in Count I because no seizure occurred in this case. The video footage provided by Defendants (Exs. 2 & 4) confirms this. The second PIT maneuver, executed by Officer Mendoza, successfully brought Mawhorter's vehicle to a stop to where he ended up on the northbound lane of US 70, facing south.[7] However, Mawhorter then reversed his vehicle and continued traveling north at high speeds on the southbound lane of US 70, and then turned onto Brady Avenue west

---

[6] *See also Bella v. Chamberlain*, 24 F.3d 1251, 1255 (10th Cir.1994) (citing *California v. Hodari D*, 499 U.S. 621, 626 (1991) (further citations omitted) (holding that individual was not seized when law enforcement official fired gunshots at his helicopter because the gunshots did not cause him to submit to the assertion of authority or otherwise succeed in stopping him); *Roska et al v. Peterson et al.*, 328 F.3d 1230 (10th Cir. 2003) (Fourteenth Amendment applied and not Fourth Amendment, where no seizure occurred).

[7] Both videotapes show the stop occurring at 6:44:55 p.m.

11

traveling against traffic, until he crashed his vehicle into a metal fence.[8] The time indicators on both videos show that there was an interval of almost two minutes between Officer Mendoza's second PIT maneuver (which temporarily brought Mawhorter's vehicle to a stop). The officers' attempts to stop Mawhorter failed, and the crash was ultimately caused not because of any show of police authority or any "seizure" that took place but because Mawhorter lost control of his vehicle. An assertion of authority by the police without submission by the fleeing person does not constitute a seizure. *See Hodari,* 499 U.S. at 626 (police pursuit in attempting to seize a person does not amount to a "seizure" within the meaning of the Fourth Amendment); *Lewis,* 523 U.S. at 834 (holding that no Fourth Amendment seizure would take place where a "pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit"); *Bella*, 24 F.3d at 1255 (no seizure occurred where law enforcement official fired gunshots at his helicopter because the gunshots did not cause him to submit to the assertion of authority or otherwise succeed in stopping him).

As a matter of law then, only the Fourteenth Amendment applies to Plaintiff's claims in Count I. This conclusion also applies to Plaintiff's excessive force claim, since it arises outside the context of a seizure. *See Latta,* 118 F.3d at 702 (assuming that excessive force claims arising outside the context of a seizure still may be analyzed under substantive due process principles) (citing *Bella v. Chamberlain*, 24 F.3d 1251, 1257 (10th Cir. 1994)); *Lewis,* 523 U.S. at 843 (substantive due process analysis is appropriate in cases that involve excessive force where a specific constitutional provision—such as the Fourth or Eighth Amendment—does not apply).[9]

---

[8] The videotapes show the crash occurring at 6:46:37 p.m.

[9] Both parties have included discussions on both the Fourth and Fourteenth Amendments. While the analysis here is limited to the Fourteenth Amendment, the Court would reach the same conclusion even under a Fourth Amendment analysis using a reasonableness standard. *See, e.g., Scott v. Harris*, 550 U.S. 372, 372 (2007) (where fleeing driver in car chase respondent posed a substantial and immediate risk of serious physical injury to others, officer's attempt to terminate the chase by forcing respondent off the road was reasonable); *see also Plumhoff v. Rickard*, 134 S. Ct. 2012, 2021 (2014) (holding that officer's attempt to terminate a dangerous high-speed car chase that threatens the

## I. Fourteenth Amendment Claim

The Fourteenth Amendment protects citizens against state actions that deprive them of life, liberty, or property without due process of law. U.S. Const. amend. XIV. The Court must examine three factors in determining whether force was excessive within the meaning of the Fourteenth Amendment: (1) the relationship between the amount of force used and the need presented; (2) the extent of the injury inflicted; and (3) the motives of the state actor. *Hannula v. City of Lakewood*, 907 F.2d 129, 131-32 (10th Cir. 1990). Force inspired by malice or by "unwise, excessive zeal amounting to an abuse of official power that shocks the conscience . . . may be redressed under [the Fourteenth Amendment]." *Hewitt v. City of Truth or Consequences*, 758 F.2d 1375, 1379 (10th Cir.1985); *Cty. of Sacramento v. Lewis*, 523 U.S. at 847 ("substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense'") (citations omitted).

The parties disagree on the level of culpability that must be shown in order to satisfy the "shocks-the-conscience" standard. Plaintiff contends that "deliberate indifference" is sufficient, while Defendants urge the court to apply an "intent to harm" level of scienter to the "shocks-the-conscience" standard. The Tenth Circuit has already considered this issue even while acknowledging that the "shocks-the-conscience" standard is difficult to define and requires an assessment of the totality of the circumstances of each particular case. *Green v. Post*, 574 F.3d 1294, 1297 (10th Cir. 2009). The court concluded that deliberate indifference should be employed "when actual deliberation is practical," –that is, when officers have "more than . . . a few seconds to think." *Id.* at 1301 (internal quotations omitted). In contrast, the "intent to harm"

---

lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death).

standard applies "whenever decisions must be made 'in haste, under pressure, and frequently without the luxury of a second chance.'" *Id.*; *Perez v. Unified Gov't of Wyandotte Cnty./Kansas City,* 432 F.3d 1163, 1166 (10th Cir. 2005) (accord); *see also Smith v. City of Thornton*, No. 12-CV-02915-WYD-MEH, 2013 WL 5420706, at *4 (D. Colo. Sept. 27, 2013) ("The determination of what standard applies hinges on deliberation *i.e.,* whether the situation is time sensitive and high pressure, or whether the police officers have the luxury to make a calm, reflective, unhurried judgment.").

Plaintiff argues that the "deliberate indifference" standard should be used because Defendants had time for deliberation before engaging in the conduct alleged to have violated Plaintiff's rights. However, the facts and evidence do not support Plaintiff's argument. The undisputed evidence demonstrates that the officers were suddenly and unexpectedly faced with a critical situation and were called upon to act out of a sense of urgency when Mawhorter made the irrational decision to change course and drive into oncoming traffic US 70, at speeds of 90-100 miles per hour. Up until that point, the officers had made the decision and were advised by dispatch, to discontinue the chase. It is clear that the officers needed to make a split-second, high-pressure decision on whether to continue the pursuit and attempt to use force to stop Mawhorter, or simply to allow him to continue on his way. Therefore, because the officers did not have time to make a calm, reflective and unhurried judgment, the Court finds that the "intent to harm" standard applies to the Fourteenth Amendment analysis in this case.

A.  Qualified Immunity

Courts have discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case." *Pearson v. Callahan,* 555 U.S. 223, 236 (2009); *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015);

*Christensen v. Park City Mun. Corp.,* 554 F.3d 1271, 1277 (10th Cir. 2009) (courts have discretion whether to address whether the plaintiff's constitutional rights were violated before turning to whether the asserted right was clearly established). The facts in this case lend themselves to the usual two-prong analysis as set forth under *Saucier v. Katz*, 533 U.S. 194 (2001), where the Court first addresses whether Plaintiff's Fourteenth Amendment constitutional rights were violated before turning to whether the asserted right was clearly established.

          1.       *Whether Defendants Violated Plaintiff's Constitutional Right*

The undisputed facts in this case both tell the story and dictate the result. In particular, the evidence presented by the dash-cam videos is striking and unequivocal, and completely supportive of Defendants' facts. *See Scott v. Harris*, 550 U.S. 372, 378-80 (2007) (in considering deputy's motion for summary judgment, courts had to view the facts in the light depicted by videotape which captured events underlying excessive force claim); *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010) (videotape controls, even if it does not capture everything); *Conner v. Rodriquez*, 891 F.Supp.2d 1228, 1230 (D.N.M. 2011) (court did not give credence to plaintiff's assertion that he was lying passively and unconscious across seat of his vehicle where video and audio evidence clearly contradicted that assertion).

While the pursuit in this case ended tragically for Ms. Woods, the injury inflicted was at all times a result of the decisions made by Mawhorter and not the Defendant officers. Mawhorter chose to flee from the officers rather than go to jail for stealing the Chevrolet pick-up truck; he decided to continue his flight at high speed and against the traffic on a highway which then put other drivers on the highway at risk and caused the officers to continue the pursuit they had intended to suspend; and even after Officer Mendoza's second and successful PIT maneuver,

15

Mawhorter refused to comply with the officers' commands to exit the vehicle but instead backed up and continued back onto US 70 against the traffic.

There was a clear and direct relationship between the amount of force used and the need presented. The high-adrenalin nature of the seven-minute chase comes across even while watching the pursuit on the videos. Moreover, the videos clearly establish that the officers did not have an opportunity for deliberation but were called upon to engage in split-second decision-making. The force used by the officers in the pursuit was at all times aimed at stopping Mawhorter before he injured or killed other motorists, and the videos confirm that the officers advised dispatch and their supervisors of the situation as it unfolded and obtained approval prior to attempting the PIT maneuvers. The videos also confirm that the officers conducted the PIT maneuvers with some caution in order to avoid risk to other drivers on the highway while at the same time acting with some urgency in attempting to bring Mawhorter to a halt.

The undisputed evidence shows that the officers' motives at all times were focused on public safety, including the officers' decision to continue the pursuit onto US 70 when the Chevrolet pick-up truck began traveling against traffic in the southbound lane. There is no evidence of any intent to harm: the officers' two PIT maneuvers were designed and intended to *stop* Mawhorter and protect the public, rather than to harm any individual. While Plaintiff argues that Mawhorter's driving north in the southbound lanes of US 70 posed no danger to the public and that the officers' decision to continue the pursuit endangered the public, the visual evidence overwhelmingly says otherwise. There is one powerful point in the video when Mawhorter veered off onto Brady Avenue, followed by Officers Quintana and Mendoza. The video clearly shows a dense grouping of cars that had come to a complete stop, allowing the officers' vehicles to pass in front of them at high speed and following the Chevrolet pick-up

16

truck onto Brady Avenue, with emergency lights on and very visible in the dark night, with sirens sounding full blast.[10] Exs. 2 & 4 (Time indicator at 6:45:33 p.m.). That scene alone evokes almost visceral images of what devastation might have occurred on that stretch of highway were it not for the officers' warning lights and sounds, and debunks Plaintiff's contention that the officers' conduct constituted excessive force under the Fourteenth Amendment—under either a deliberate indifference or intent to harm standard.[11]

### 2. *Whether Law Was Clearly Established*

The Court need not address whether the law clearly established as the second part of the qualified immunity analysis, having found that Defendants did not violate Plaintiff's constitutional right under the Fourteenth Amendment. *See Pearson,* 555 U.S. at 236 (noting there is no need to decide difficult constitutional questions "when there is available an easier basis for the [qualified immunity] decision").

## II. Claims Against DPS and Officers in Their Official Capacities

Defendants also contend that Count I fails to state a claim under §1983 against Defendants DPS and NMSP and the officers in their official capacities. Plaintiff does not devote much time to this issue, but insists in footnote (*see* Doc. 26 at 3, n.1) that local governing bodies can be sued directly as "persons" under §1983, pursuant to the United States Supreme Court's decision in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). In light of the Court's disposition of this case on liability, it is not necessary to address this issue, but the Court does so here in the interest of a complete record for a possible appeal.

---

[10] In both videos, the time record for this event is at 6:45:33.

[11] The Court has undertaken the analysis under an "intent to harm" standard which is appropriate under the facts of this case, but submits that even using a deliberate indifference standard, Plaintiff's claim would fail. The undisputed facts (including the videotape) show that the officers' decisions were made in the context of concern for public safety, which would not meet even a deliberate indifference standard.

17

Plaintiff is correct that *Monell* held that local government units were "persons" for purposes of § 1983. However, in *Will v. Michigan Dep't of State Police*, the Supreme Court specifically noted that *Monell* had limited its holding "to local government units which are not considered part of the State for Eleventh Amendment purposes." 491 U.S. 58, 70 (1989) (Eleventh Amendment barred action against Michigan Department of State Police and its director) (citing *Monell,* 436 U.S. at 690). The Supreme Court held that neither states nor state officials acting in their official capacities are "persons" within the meaning of §1983, and limited its own holding to "States or governmental entities that are considered to be "arms of the State" for Eleventh Amendment purposes." *Id.,* cited in *Daddow v. Carlsbad Mun. Sch. Dist.*, 1995-NMSC-032, ¶ 9, 120 N.M. 97, 101 ("harmonizing *Monell* and *Will,* we see that if an entity is a local governing body with specific discretionary powers and duties, it is not a true "arm of the state" and is not entitled to the state's Eleventh Amendment protections"); *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280 (1977) (state departments and agencies considered to be "arm[s] of the state" are not amenable to suit under §1983). Thus, the question here is whether NMSP and DPS are local governmental bodies (or political subdivisions) that are amenable to suit as "persons" under §1983 (such as cities or counties under *Monell)* or "arms of the State" which are immune from suit.

Reference to a relevant New Mexico statute resolves this issue. The New Mexico DPS was statutorily created in the "executive branch" of state government, with various subdivisions within that department, including the New Mexico state police division, meaning that DPS (and the inclusive NMSP). NMSA 1978 § 9-19-4 (NMSP created as a division of a "cabinet department" in the executive branch of state government with subdivisions). *See also Clark v. Maryland Dept. of Public Safety and Correctional Services*, 316 Fed.Appx. 279, 282, 2009 WL

646247, *2 (4th Cir. 2009) (state's department of public safety was arm of state and immune from suit under Eleventh Amendment); *Black-Hosang v. Ohio Dept. of Public Safety*, 96 Fed.Appx. 372, 2004 WL 950066 (6th Cir. 2004) (noting in dicta that the Ohio Department of Public Safety was immune from suit under § 1983). This leads to the inevitable conclusion that the DPS is an "arm of the state" and therefore cannot be sued as "persons" under §1983 and must be dismissed from this lawsuit.[12]

The individual Defendants in their official capacity also must be dismissed. A suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office and as such is no different from a suit against the State itself. *Brandon v. Holt,* 469 U.S. 464, 471 (1985); *Kentucky v. Graham,* 473 U.S. 159, 165–166 (1985); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71(1989).

## CONCLUSION

The Court finds and concludes that Defendants DPS (including NMSP) are immune from suit because they are not "persons" under §1983, and that the individual defendants in their official capacity must be dismissed for the same reason. The individual defendants in their official capacity also must be dismissed.

The Court acknowledges the unfortunate, tragic and senseless nature of events in this case which ended in Ms. Woods' death, but culpability for her death lies squarely with Kyle Mawhorter and not with Officers Quintana and Mendoza. The Court finds and concludes that the force used by Officers Quintana and Mendoza does not meet the "shocks the conscience" standard and thus, was not excessive within the meaning of the Fourteenth Amendment.

---

[12] This Court has previously taken up this issue, finding that DPS was immune from suit under §1983. *See Connor v. Rodriguez,* 2010 U.S. Dist. LEXIS 146996 at *4-7 (D.N.M. 2010) (Johnson, J.); D.Ct. Civil No. 10-00512 WJ/WDS, Doc. 20 (9/15/2010).

**THEREFORE,**

**IT IS ORDERED** that Defendants' Motion for Summary Judgment based on Qualified Immunity **(Doc. 19)** is hereby GRANTED for reasons described in this Memorandum Opinion and Order.

A Rule 58 Judgment shall issue separately.

_____
UNITED STATES DISTRICT JUDGE